# IN THE UNITED STATES DISTRICT COURT

# DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| In re: D.E.I. SYSTEMS, INC. aka DELTA FIBERGLASS, aka DELTA EQUIPMENT INDUSTRIAL SYSTEMS, INC., aka DELTA ENVIRONMENTAL, INC.<br><br>Debtor. | **MEMORANDUM DECISION AND ORDER**<br><br>Case No. 2:11-cv-00343-CW<br>Bankr. Case No. 07-24224 (A.P. 09-02082)<br><br>Judge Clark Waddoups |
| KENNETH A. RUSHTON, in his capacity as Trustee,<br><br>Plaintiff,<br><br>vs.<br><br>DAVID BEVAN, an individual; and BENEDICT BICHLER, an individual,<br><br>Defendants. | |

## **INTRODUCTION**

This matter is before the court on defendants David Bevan ("Bevan") and Benedict Bichler ("Bichler") (collectively "Defendants") Motion for Partial Summary Judgment (Dkt. No. 22). Defendants move to dismiss Plaintiff Kenneth A. Rushton's ("Plaintiff" or "Trustee") First and Second Claims for Relief as asserted in the Amended Complaint filed with the Bankruptcy Court on January 12, 2012 (Bankr. Court Dkt. No. 106). In response, Plaintiff filed a Motion to Strike and a Cross Motion for Partial Summary Judgment (Dkt. No. 26). On November 1, 2013 the court heard oral argument on the motions and denied the Motion to Strike. The remaining two motions were taken under advisement.

For the reasons stated herein, the court now GRANTS Defendants' Motion for Partial Summary Judgment and DENIES Plaintiff's Cross Motion for Partial Summary Judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

**A. Procedural Background**

This case comes to the court via the U.S. Bankruptcy Court.[1] In the original Bankruptcy Court Proceedings, Plaintiff asserted four Claims for Relief. Both Plaintiff and Defendants filed Motions for Partial Summary Judgment on the First and Second Claims for Relief. The Bankruptcy Court denied Defendants' Motion for Partial Summary Judgment and granted Plaintiff's Cross Motion for Partial Summary Judgment (Bankr. Court Dkt. Nos. 52-54). Defendants then sought leave to file an interlocutory appeal of that ruling to the U.S. District Court (Bankr. Court Dkt. Nos. 58-60). Defendants also subsequently filed a Motion for Partial Summary Judgment on the Third and Fourth Claims for Relief (Bankr. Court Dkt. No. 65).

Following a hearing on June 23, 2011, the court deferred ruling on Defendants' Motion for Interlocutory Appeal, pending the Bankruptcy Court's decision on partial summary judgment of the Third and Fourth Claims for Relief (Dkt. No. 9). On November 29, 2011, the Bankruptcy Court entered an order granting Defendants' Motion for Partial Summary Judgment on the Third and Fourth Claims, and dismissing with prejudice claims Three and Four, to the extent they were based on Utah Code Ann. § 25-6-6 (Bankr. Court Dkt. Nos. 92 and 99). To the extent the claims were not dependent on state law, the order left them untouched. Following that decision, Defendants sought withdrawal of the bankruptcy reference and Plaintiff consented. In an order dated November 21, 2012, the court accepted a complete withdrawal of the reference, agreeing to hear the case *de novo*, thereby rendering moot the Motion for Interlocutory Appeal (Dkt. No.

---

[1] The original case number for these proceedings is Bankr. Case No: 07-24224 (A.P. 09-02082). As explained, *infra*, reference for the case was withdrawn, and the Bankruptcy Court Docket was filed as Dkt. No. 21 in this case, on April 22, 2013.

16). On April 19, 2013, the withdrawn case was consolidated with the instant matter (No. 2:11-cv-00343) and this case was designated the lead case.

On May 17, 2013, in the newly consolidated proceedings, Defendants filed a Motion for Partial Summary Judgment on the First and Second Claims for Relief (Dkt. No. 22). In response, on June 17, 2013, Plaintiff filed a Motion to Strike and a Cross Motion for Partial Summary Judgment (Dkt. Nos. 25 and 26). On November, 1, 2013, the court heard oral argument on all three motions and denied from the bench Plaintiff's Motion to Strike (Dkt. No. 35). The two remaining Motions for Partial Summary Judgment are now before the court.

**B. Factual Background**

Up until May 2004, Defendants owned 100% of the outstanding stock of Delta Equipment Systems, Inc., a Utah Corporation doing business as DEI Systems, Inc. ("DEI-UT"). In May 2004, Defendants entered into a "Purchase Agreement," consisting of a series of transactions whereby Defendants sold 44.843% of their shares of DEI-UT to Environmental Services Group ("ESG") for the purchase price of $4,000,000 and DEI-UT redeemed an additional 43.946% of Defendants' shares of DEI-UT for $3,920,000 ("the Redemption Amount"), with the Redemption Amount to be paid by DEI-UT at closing. Payment was to be made in cash, by certified check or wire transfer of immediately available funds to the account, or accounts, designated by Defendants. At closing, Defendants delivered the redeemed shares to DEI-UT.

To facilitate the Purchase Agreement, ESG made a secured loan[2] to DEI-UT in the total amount of $7,520,000.[3] This amount included the $3,920,000 Redemption Amount. ESG wired

---

[2] Defendants dispute the characterization of the disbursement of funds as a "loan" from ESG to DEI-UT, instead contending that it was "an infusion of capital into DEI-UT by its new majority shareholder, ESG, and the 'loan' should be recharacterized as an equity infusion" (Defendants' Memorandum in Opposition to Trustee's Cross Motion for Partial Summary Judgment, Dkt. No. 28 at 3). However, as Defendants note, "the determination whether

3

the $7,520,000 from its Union Bank of California account to a Wells Fargo Bank trust account belonging to Ray, Quinney & Nebeker, DEI-UT's attorneys. Under the terms of the Purchase Agreement, and pursuant to Bichler's instructions, $2,088,576 of the Redemption Amount funds was then wired from the Wells Fargo account to Bichler's account at Barnes Bank. Under the terms of the Purchase Agreement, and pursuant to instructions from Bevan, a check in the amount of $1,831,124 (also from the Redemption Amount funds) made payable to Bevan was drawn on the Wells Fargo Account.

Finally, under the Purchase Agreement, DEI-UT merged into D.E.I. Systems, Inc., ("D.E.I."). More than three years later, on September 7, 2007, D.E.I. filed for Chapter 11 bankruptcy protection. On April 15, 2008, D.E.I. converted its case to a proceeding under Chapter 7 and Plaintiff (Rushton) was appointed Trustee. On February 25, 2009, Plaintiff commenced adversary proceedings against Defendants, alleging fraudulent transfer(s) in order to recover the funds paid to them by DEI-UT, specifically the $2,088,576 paid to Bichler and the $1,831,124 paid to Bevan.

## ANALYSIS

### A. Standard of Review

The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The court should state on the record the reasons for granting or denying the motion. Fed. R. Civ. P. 56(a), (c)(2).

---

funds were a 'loan' or an equity infusion is not relevant to the Section 546(e) defense, so this dispute between the parties does not give rise to a material disputed fact" for the purpose of ruling on the motions before the Court (*id*).

[3] The difference between the $7,920,000 total purchase price and the actual transfer amount of $7,520,000 is the result of a $400,000 holdback provided for in the Purchase Agreement (Dkt. No. 22, at IV Note 2).

For purposes of this Motion and Cross Motion, the parties do not dispute the facts above, except as provided at note 2, *supra*, and note 4, *infra* (Dkt. No. 22, at iii-x; Dkt. No. 24, at 7-8).[4] Because there is no genuine dispute as to any material fact, all that remains for this court to determine is which of the two parties is entitled to judgment as a matter of law on their respective motions.

## B. Legal Principles

Under 11 U.S.C. § 544, a Trustee has the rights and powers to avoid a broad range of property transfers made, or obligations incurred, by a debtor. 11 U.S.C. § 546(e) establishes a so-called "safe harbor" exemption, which places certain payments and transactions beyond the reach of the Trustee. Section 546(e) reads:

> Notwithstanding sections 544, 545, 547, 548(a)(1)(B), and 548(b) of this title, the trustee may not avoid a transfer that is a margin payment, as defined in section 101, 741, or 761 of this title, or *settlement payment*, as defined in section 101 or 741 of this title, *made by or to (or for the benefit of)* a commodity broker, forward contract merchant, stockbroker, *financial institution*, financial participant, or securities clearing agency, **or** *that is a transfer made by or to (or for the benefit of)* a commodity broker, forward contract merchant, stockbroker, *financial institution*, financial participant, or securities clearing agency, *in connection with a securities contract*, as defined in section 741(7), commodity contract, as defined in section 761(4), or forward contract, that is made before the commencement of the case, except under section 548(a)(1)(A) of this title. 11 U.S.C. § 546(e) (emphasis added).

In determining whether a transaction falls within the ambit of the "safe harbor," the Tenth Circuit has applied the plain language of § 546(e) and construed it broadly. Only when application of the plain language is absurd or unreasonable may the Court look beyond the plain language of the statute. *Kaiser Steel Corp. v. Pearl Brewing Co. (In re Kaiser Steel Corp.)*, 952 F.2d 1230, 1240 (10th Cir. 1991), *cert denied* 505 U.S. 1213 (1992). Not only is the statute as a whole to be

---

[4] Defendants "dispute that DEI-UT was rendered insolvent on May 14, 2004," as alleged by Plaintiff. (Dkt. No. 28, at 4). However, as with Defendants' other disputation of fact, they readily note that whether or not DEI was insolvent on that date is irrelevant to the proper application and interpretation of § 546(e) and thus is not a genuine dispute of material fact for the purpose of deciding these motions.

understood according to its plain language, but the individual terms contained in the statute should be interpreted plainly. *Id.* at 1237 (the term "settlement payment" should be interpreted "as it is plainly understood within the securities industry"); *see also Id.* at 1240 ("On its face, the statute is clear. The statute exempts payments made '*by or to*' a stockbroker, financial institution, or clearing agency. Again, unless there is some reason to believe the clear application is absurd or otherwise unreasonable, we can leave our inquiry at that.").

Following the plain language of § 546(e), there are at least two types of property transfers which cannot be avoided. The first type of unavoidable transfer is a *payment* (either a "margin payment" or a "settlement payment") made *by or to* or for the benefit of one of several specified entities: a commodity broker, forward contract merchant, stockbroker, *financial institution*, financial participant, or securities clearing agency. The second type of unavoidable transfer is any *transfer* made *by or to* or for the benefit of the same specified entities, that is made *in connection with a securities contract*, a commodity contract, or a forward contract. 11 U.S.C. § 546(e) (see statutory language with emphasis added, *supra*).

The term "settlement payment" means "a preliminary settlement payment, a partial settlement payment, an interim settlement payment, a settlement payment on account, a final settlement payment, or any other similar payment commonly used in the securities trade." 11 U.S.C. § 741(8). This definition of settlement payment, as applied by the courts, is broad enough to encompass a wide range of payments and transactions. *Kaiser Steel*, 952 F.2d at 1237. *See also In re Plassein Int'l Corp.,* 590 F.3d 252 (3rd Cir. 2009) (even settlement payments which do not come through the "settlement system" are covered by § 546(e) so payments made by wire transfer directly to shareholder's bank accounts fell under safe harbor); *Enron Creditors Recovery Corp. v. Alfa, S.A.B. de C.V.*, 651 F.3d 329 (2d Cir. 2011) (safe harbor has a broad

6

catchall of "any other similar payment"); *AP Services LLP v. Silva*, 483 B.R. 63 (S.D.N.Y. 2012) (payments made by wire transfer to defendant's bank accounts in the context of a securities transaction fell under the safe harbor, despite the fact that the financial institution was only an intermediary and took no beneficial interest in the transaction).

The term "financial institution" is defined in 11 U.S.C. § 101(22)(A) as

> Federal reserve bank, or an entity that is a commercial or savings bank, industrial savings bank, savings and loan association, trust company, federally-insured credit union, or receiver, liquidating agent, or conservator for such entity and, when any such Federal reserve bank, receiver, liquidating agent, conservator or entity is acting as agent or custodian for a customer (whether or not a "customer", as defined in section 741) in connection with a securities contract (as defined in section 741).

The meaning of the phrase "by or to" in § 546(e) was directly considered by the Tenth Circuit in *Kaiser Steel*. There, the Court held that "by or to" means just that – payments made either by or to a financial institution. The understanding and application of the phrase does not generally require careful parsing or close semantic scrutiny.[5] "On its face, the statute is clear. The statute exempts payments made *'by or to'* a stockbroker, financial institution, or clearing agency. Again, unless there is some reason to believe the clear application is absurd or otherwise unreasonable, we can leave our inquiry at that." *Kaiser Steel*, 952 F.2d at 1240.

The term "securities contract" is defined in 11 U.S.C. § 741(7)(A) to include "a contract for the purchase, sale, or loan of a security . . . *or any other agreement or transaction that is similar to an agreement or transaction referred to in this subparagraph*" (emphasis added).

Finally, as explained, *supra,* unless the result would be absurd or otherwise unreasonable, the court applies these statutorily and judicially established definitions to

---

[5] While *Kaiser Steel* was decided in the context of publicly traded stock and the settlement payments at issue here are private, there is no reason to conclude that "settlement payments" and "by or to" are unambiguous in the public securities arena, but somehow ambiguous when dealing with privately traded securities. *See, e.g., In re QSI Holdings, Inc.*, 571 F.3d 545, 549 (6th Cir. 2009) (rejecting limitations on the definition of "settlement payments" which would exclude transactions in privately held securities).

7

the facts of the present case. *Kaiser Steel*, 952 F.2d at 1237. If, using these definitions, a transaction falls into one of the two types of property transfers identified above, it comes within the safe harbor exception and may not be avoided by a trustee seeking to exercise authority under 11 U.S.C. §§ 544, 546(e).

**C. Application**

Plaintiff, as trustee, is attempting to exercise his authority under § 544 to avoid the nearly $4 million in payments made to Defendants by DEI-UT. Because the payments fall within the plain language of the safe harbor exception, the payments may not be avoided. Moreover, because the application of the plain language of § 546(e) produces a result which is neither absurd nor unreasonable, the court need not go beyond the language of the statute to make its determination.

The payments made to Bevan and Bichler qualify for the safe harbor exemption under both categories of property transfers identified by the court. The payments were settlement payments made by or to financial institutions. The payments were also transfers made by or to a financial institution in connection with a securities contract. Therefore, the payments may not be avoided.

The payments to Bevan and Bichler were settlement payments. Under 11 U.S.C. § 741(7)(A) both a "partial settlement payment" and a "final settlement payment" constitute a "settlement payment." The payment of $1,831,124 to Bevan and $2,088,576 to Bichler were partial settlement payments in that they represented a portion of the $7,520,000 total paid to Defendants in exchange for their shares. In a separate, but related transaction, Defendants also sold 44.843% of their DEI-UT shares to ESG. Thus, the $3,920,000 in payments from the Redemption Amount does not represent a complete settlement payment, but plainly constitutes a "partial settlement payment." The payments were also final settlement payments, in that they

8

represented the final payment in completion of the Purchase Agreement (the first being the sale of 44.843% of their shares to ESG). There were no other payments to be made under the Purchase Agreement, and, therefore, the payments were final. Because the payments were both partial and final settlement payments, they qualify as payment settlements for the purposes of § 546(e).[6]

Moreover, in light of the Tenth's Circuit's broad reading of "settlement payment" in *Kaiser Steel*, as well as other courts' applications of the term in *In re Plassein*, and *Enron Creditors Recovery Corp.*, it is clear that even if the payments did not come through a formal "settlement system," they still constitute settlement payments. Likewise, payments of the sort made to Bevan and Bichler under the Purchase Agreement are not uncommon and easily fall within the broad catchall of § 546(e) (via 11. U.S.C. § 741(8)).

The payments at issue were made both by and to at least one financial institution. Payments in the amounts of $1,831,124 and $2,088,576, respectively, were made to Bevan and Bichler's bank accounts from the total Redemption Amount of $3,920,000. The Redemption Amount was a portion of the funds which were originally wired from Union Bank of California to a Wells Fargo Bank trust account. Bichler's individual payment was then wired from Wells Fargo Bank to Barnes Bank and a check was drawn on the Wells Fargo Bank account in order to

---

[6] Trustee Rushton objects to such a plain interpretation of the term "settlement payments," relying heavily on the Bankruptcy Court's determination that the payments were not settlement payments because they were not "of the type commonly used in the securities trade." The primary reason for this determination was that the payments were for the private, rather than public sale of securities. As noted at n.5, private security sales have been widely accepted as "settlement payments" by the courts. Moreover, the additional requirement of "indicia" of commonality espoused by the Bankruptcy Court are not requirements in any sense, but mere factors which the Sixth Circuit used to guide its reasoning in ultimately finding that private securities fell within the safe harbor provision. Equally readily applicable is the guidance from cases such as *In re Resorts International, Inc.*, 181 F.3d 505 (3rd Cir. 1999), which held that settlement payments include "almost all securities transactions," and *In re Contemporary Industries Corp.*, 564 F.3d 981, 986 (8th Cir. 2009), noting that "[n]othing in the relevant statutory language suggests that Congress intended to exclude these payments from the statutory definition of 'settlement payment' simply because the stock at issue was privately held." Moreover, there is nothing to suggest that smaller transfers such as these (a "mere" $3.92 million) are not common in the securities trade. *Kaiser Steel* suggests, and the plain language nearly compels, a finding that the payments to Bevan and Bichler constitute "settlement payments" in every sense.

pay Bevan. These payments were made both by, and to, *at least* one financial institution under 11 U.S.C. § 101(22)(A) – Wells Fargo Bank. Because the payments were settlement payments, made by or to a financial institution, they fall within the safe harbor of § 546(e).

The payments also qualify for the safe harbor because they are transfers made by or to a financial institution in connection with a securities contract. This application of § 546(e) is even more plain than the first. Regardless of whether or not the payments made to Bevan and Bichler were settlement payments, there is no disputing that they were transfers. ESG's money was wired from Union Bank of California to Wells Fargo, and then from Wells Fargo to Barnes Bank and finally, via a check, to Bevan directly. As noted above, these transfers were made both by and to at least one financial institution: Wells Fargo Bank. Finally, all of these transfers were made as part of a securities contract – namely the Purchase Agreement – whereby Defendants transferred roughly 88% of their shares to ESG and DEI-UT in exchange for a total of $7,520,000. At closing, the payments were made and the shares delivered. This plainly qualifies as "a contract for the purchase [or] sale…of a security." At the very least, it is "an agreement or transaction that is similar to" a contract for the purchase or sale of a security, thus satisfying 11 U.S.C. § 741(7)(A).[7] Therefore, because the payments were transfers made both by and to financial institutions in connection with a securities contract, they cannot be avoided.

Trustee Rushton objects that the payments were not made *to*, but rather *through* the financial institutions, and that because the financial institutions were merely "conduits" for the

---

[7] The Bankruptcy Court also concluded that, because the banks were not "involved with the substance of the purchase agreement" and because "any bank could have facilitated the payments, because the payments could have been made in cash, [and] the payments could [even] have been effected without the involvement of any bank" that the transfers were not made in connection with a securities contract. The Bankruptcy Court feels that "in connection with" requires more than merely facilitating a payment between two parties. This is little more than a re-hashing of the conduit argument discussed *infra*, and overlooks the fact that the primary role of banks "in connection with" securities contracts is to facilitate payment. The plain language of the statute does not require that the bank be "essential to the purchase agreement" as the Bankruptcy Court claims, only that it make, among other alternatives, a "payment" or "transfer" "in connection with" a securities contract. Wells Fargo has done just that.

10

transaction, the safe harbor exemption should not apply. Rushton attempts to factually distinguish the cases which reject the "mere conduit" analysis which he proposes. This attempt fails, and while there is some split authority, Rushton concedes that the Second, Third, Sixth, and Eighth Circuits all "would apply the safe harbor even if the financial institution is merely a conduit."[8] Rushton also attempts to distinguish cases which reject the conduit theory based on the amount of the transaction involved, the transmission of shares along with funds, and generally arguing that the cases are not binding on this court. They may not be binding, but they remain persuasive. Given cases such as *Enron*, which supports an extremely broad interpretation, and *AP Services,* which is highly factually analogous, there is ample support for the acceptance of the rule that, even when a financial institution is a "mere conduit," payments made by or to it still qualify as payments made "by or to" it.

Both Rushton and the previous Bankruptcy Court decision cite one Tenth Circuit case, *Rupp v. Markgraf*, for the contention that "the Tenth Circuit has adopted the conduit theory that banks are not initial transferees where they are simply honoring their contracts with customers." Dkt. No. 34 at 7 (citing *Rupp v. Markgraf*, 95 F.3d 936, 939 (10th Cir. 1996)). Rushton overstates the importance of *Markgraf* to the issue presented here. *Markgraf* is distinguishable.[9] The Bankruptcy Court's analysis would define a "transfer" under *Markgraf* as "parting with property or an interest in property." *Bankruptcy Court Opinion* at 9. This definition is statutory, and is applied in *Markgraf*, but the Bankruptcy Court's definition of "transferee" – the requirement of obtaining a beneficial interest in property and the rule that if a party "is not a

---

[8] Rushton alleges that the Court's main reason for doing so, at least in the Second Circuit, is to maintain "consistency with its prior decision." (Dkt. No. 34 at 8) The Court fails to see why this reason is inadequate. Adhering to one's own precedent is generally accepted as a sound jurisprudential principle which promotes stability and predictability in the administration of justice.

[9] Among other things, if this were the holding of *Markgraf*, it would be remarkable because it may be argued that almost any securities transaction in which a bank engages is done in the course of "simply honoring its contracts with customers" and all securities at issue would have to pass through the hands of financial institutions, along with the payments in order for § 546(e) to apply.

transferee in a transaction, it cannot be a transferor of the same property" – does not come from *Markgraf*. Rather, they come from authority from the Eleventh Circuit and the Massachusetts Bankruptcy Court. *Id*. at 9 n.21.[10] The fact, then, that Wells Fargo never obtained a "beneficial interest" as a result of the Purchase Agreement does not mean that it does not qualify as a financial institution under Tenth Circuit law. Wells Fargo did, however, part with property – money from the trust account – thereby satisfying the statutory definition of transfer, contrary to the Bankruptcy Court's conclusion.[11]

Moreover, when Congress amended § 546(e) by adding the parenthetical "(or for the benefit of)" following the phrase "made by or to,"[12] standard rules of construction require the phrase "made by or to" must mean something different than "for the benefit of."[13] Since "for the

---

[10] Markgraf, on the other hand, relies on the principles of dominion and control to define an "initial transferee."

[11] A closer look at *Markgraf* reveals several other distinctions. First, *Markgraf* involves the control and dominion over funds from a cashier's check in the context of an alleged fraudulent transfer. It was an attempt to recover under 11 U.S.C. § 550 from an "initial transferee." Section 546(e) does not require that a financial institution be an initial transferee, therefore *Markgraf* is not directly on point. Moreover, at least for the purposes of this motion, there is no allegation of a fraudulent transfer made under the guise of a payment to a bank; indeed there is no evidence of impropriety of any sort in the actual transmission of funds to Defendants. Neither Bevan nor Bichler nor ESG sent a note with the payment instructing specific disbursements to personal judgment creditors. Rather, all payments were made in accordance with the Purchase Agreement. The payments here were wire transfers, originating from one financial institution (Union Bank) to another (Wells Fargo). Finally, *Markgraf* was decided in 1996, almost ten years before the broadening of the scope of the safe harbor protections discussed in both motions and the rule of *Markgraf* is in tension with the broad interpretation espoused in *Kaiser Steel*. Given the extent of the consensus that the terms of § 546(e) should be construed broadly, and despite the disagreement about the exact breadth, the emerging consensus (indeed, in some cases the explicit conclusion) is that payments made through financial institutions acting as "mere conduits" still qualify for safe harbor protection.

[12] In 2006 Congress amended §546(e) "(A) by inserting the language '(or for the benefit of)' before 'a commodity broker'; and (B) by inserting 'or that is a transfer made by or to (or for the benefit of) a . . . financial institution . . . in connection with a securities contract . . . after 'securities clearing agency;'" Financial Netting Improvements Act of 2006, Pub. L. No. 109-390, § 5(b)(1), 120 Stat. 2692 (2006).

[13] In 1879 the Supreme Court noted, "as early as Bacon's Abridgement, sect. 2, it was said that 'a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant." *Market Co. v. Hoffman*, 101 U.S. 112, 115, 25 L.Ed. 782 (1879). If "made by or to" were understood to require that the financial institution have a beneficial interest in the transfer, it would render the language "or for the benefit of" superfluous, void and insignificant. *See also Williams v. Taylor*, 529 U.S. 362, 404 (2000) (this is a "cardinal principle of statutory construction"); *United States v. Menasche*, 348 U.S. 528, 538-539 (1955) (It is the duty of the court to give effect to every clause and word of a statute); *Duncan v. Walker*, 533 U.S. 167, 174 (2001). For the recent application of this rule in the Tenth Circuit see, e.g., *Rajala v. Gardner*, 709 F.3d 1031, 1038 (10th Cir. 2013) ("cardinal principle" of statutory construction that no clause or sentence or word shall be superfluous, void or insignificant); *see also Lockheed Martin Corp. v. Admin. Review Bd., U.S. Dept. of*

benefit of" embraces a beneficial interest in the securities, "made by or to" cannot be read to include that requirement. Thus, the section must be read to mean that Congress rejected the argument that the bank must have some beneficial interest at stake, not merely be honoring a contractual obligation to its account holder.

Finally, applying the plain language of § 546(e) to the facts in this case does not produce an absurd result. At most, the protection afforded transactions by a plain application of the statute may be deemed broad, but there is nothing unreasonable or absurd about broad protections for financial transactions.[14] While it is not the place of the court to determine public policy, there are several immediately cognizable reasons supporting a conclusion that Congress intended such a policy. First, such a policy promotes stability in the financial and securities market, and encourages the use of legitimate financial channels. It promotes open and honest accounting and discourages "off the books" dealing. If legitimate settlement payments could be undone because the financial institutions involved were "mere conduits" then consumer confidence in the finality of securities sales would be undermined, with a ripple effect on global markets. Additionally, calling this result absurd ignores the fact that there is an exception to § 546(e) for truly fraudulent transfers, "made with actual intent to hinder, delay or defraud." 11 U.S.C. § 548(a)(1)(A). These fraudulent transactions would not be put beyond reach simply because they were made through a financial institution. In sum, applying the plain language of this section does not produce a result so absurd as to set aside *Kaiser Steel's* interpretive

---

*Labor*, 717 F.3d 1121, 1130 (it is "rudimentary" that statutory language should be read so as to give each provision or phrase separate and distinct meaning).

[14] The Bankruptcy Court reasoned that applying the plain language of "by or to" a financial institution would produce an absurd result, because "no settlement payment or transfer in connection with a securities contract may be avoided if the payment is effected with the assistance of the banking industry." As noted, there are several legitimate policy reasons why such a result is not so bizarre that Congress could not have intended it. Indeed, the fraudulent transfer exception embedded in § 546(e) suggest that Congress contemplated a broad, over-arching protection, and took steps to prevent its abuse.

standard. Therefore, the court need not go beyond the face of the statute in determining whether the safe harbor exemption applies.

In sum, because an application of the plain statutory language reveals that the payments made to Bevan and Bichler were both settlement payments made by or to a financial institution *and* transfers made by or to a financial institution in connection with a securities contract, the payments fall within the safe harbor provision of 11 U.S.C. § 546(e). Additionally, because such an application does not produce an absurd or unreasonable result, the court need not look beyond the face of the statute in making its decision in this case.

## **CONCLUSION**

For the reasons stated above, Defendant's Motion for Partial Summary Judgment (Dkt. No. 22.) is GRANTED and Plaintiff's Cross Motion for Partial Summary Judgment (Dkt. No. 26) is DENIED.

SO ORDERED this 23rd day of January, 2014.

BY THE COURT:

_____
Clark Waddoups
United States District Judge